UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WILLIAM BELL,

                              Plaintiff,

                                                              DECISION AND ORDER

                                                              03-CV-6040L

                 v.

ROCHESTER GAS & ELECTRIC CORP.,
ENERGETIX, INC.,
GRIFFITH OIL CO., INC.,
ENERGY EAST CORPORATION,
WILLIAM DIAMOND,
JERRY STRASSNER
BARNEY FARNSWORTH,


                              Defendants.

_____


        Plaintiff William Bell ("Bell") brings this action against defendants alleging discrimination

in employment on the basis of race and the taking of FMLA leave, pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York Human Rights Law, N.Y.

Exec. Law §§290 et seq. ("NYHRL"), the Family and Medical Leave Act, 29 U.S.C. §2601 et seq.

("FMLA"), and the Rochester Municipal Code.  On May 18, 2004, the Court dismissed Bell's claims

against Energy East Corp., his Title VII claims against the individual defendants, and his FMLA

claim against Griffith Oil Co., Inc. ("Griffith Oil") (Dkt #52).  Defendants now move for summary

judgment dismissing the remainder of Bell's claims, or in the alternative, for an *in limine* order

prohibiting Bell from offering a particular document into evidence at trial (Dkt. #74).  For the reasons that follow, defendants' motion for summary judgment is granted, and the complaint is dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Bell first worked as a contract employee for defendant Energetix, Inc. ("Energetix") from February 14, 2000 to October 1, 2000 in Energetix's Credit and Collections Department.  He was hired by individual defendant Barney Farnsworth ("Farnsworth") and supervised by individual defendant William Diamond ("Diamond").  Bell completed this assignment without incident.

In September 2000, Bell applied for a billing specialist opening in Energetix's Supply Group. After an interview, Farnsworth hired him for that position on October 2, 2000.  As a billing specialist, Bell was supervised by Farnsworth and individual defendant Jerry Strassner ("Strassner"). Bell's duties included setting up purchases of electricity supply for Energetix customers and scheduling gas supply.  At the time, Bell was the only African-American individual employed by Energetix.

Shortly after being hired, Bell informed Farnsworth that he was looking for additional income and would welcome the opportunity to work overtime.  Energetix subsidiary Griffith Oil had a five day per week opening from 4:00pm to 7:30pm to assist employee Mike Turley ("Turley"), which Bell was offered and accepted. At all relevant times, Bell was supervised at both Energetix and Griffith Oil by Farnsworth, and was paid for both jobs by Energetix.

Bell encountered some difficulties with the Supply Group position.  In September 2001, Farnsworth met with Bell to discuss various performance problems.  Although the parties differ as

- 2 -

to whether the possibility of transferring Bell to another department originated with Bell or Farnsworth, the result was that Farnsworth consulted with Credit and Collections Department supervisor Diamond to inquire about transferring Bell to that department, where he had previously worked. Diamond recommended the transfer to his own supervisor, Chris Modesti ("Modesti"), and Bell was transferred to Credit and Collections in November 2001, with no loss of pay or benefits.

Throughout Bell's employment with Energetix, his wife, Lenora Johnson, was an Energetix customer with a variable rate contract. (Her records also reflected a prior, fixed rate contract, which had been canceled by the customer before going into effect.) In December 2001, Energetix initiated an employee discount program which charged four cents less per therm of gas on their Energetix bill. Bell inquired of Energetix employee Sandra Koch ("Koch") whether he was eligible for the program. Koch stated that he was, confirmed with Bell that he wished the account to remain on a variable rate rather than lock into a fixed rate, approved Bell's employee discount for Ms. Johnson's account, and entered it into Energetix's computerized billing system.

In February 2002, without authorization, Bell accessed the Energetix computer billing system, opened his wife's account, and attempted to alter the billing rate from variable to a fixed rate of 41.5 cents. His changes were recorded but not "saved" to the system, and therefore did not take effect.

In late April 2002, Bell again attempted to change the billing rate on his wife's account, by printing out a billing statement and adding a notation that the customer had complained that her rate was too high, and should be adjusted to the fixed rate of 41.5 cents, per her contract. Without

identifying the account as his own, Bell gave the printout to Customer Service Representative Brian Buttars ("Buttars") and asked him to make the requested change.

From April 26, 2002 through May 21, 2002, Bell was out on a disability leave due to surgery.

Meanwhile, back at Energetix, Buttars was attempting to make the requested changes to the Lorena Johnson account. He showed Bell's note to employee Laurel Ford ("Ford") and requested a copy of the contract for that account. In responding to Buttars, Ford discovered that the account appeared to have been tampered with. She alerted her supervisor, Sandy Koch ("Koch") to the problem.

Upon investigation, Koch found that Energetix's computer records showed two accounts for Lenora Johnson. The first, a fixed-rate account, had been set up and canceled before it began at the customer's request. The gas field for that account, however, had been altered to reflect an open contract. The second account, which was the active one for Energetix billing purposes, showed a fixed billing rate of 52.5 cents, which was the current rate for one year fixed-term contracts. The end date, however, had been entered as 9999, or an indefinite term. The collective changes suggested that someone had attempted to change the existing contractual variable rate for Lenora Johnson's account to a fixed rate of unlimited duration. At some point it was also discovered that the original copy of Lenora Johnson's contract was missing from the locked cabinet where it had been kept, and to which Bell had access.

Koch contacted Bell's supervisor, Diamond, to discuss Bell's note to Buttars and the apparent tampering with Lenora Johnson's accounts. Diamond took the information to his own supervisor, Modesti.

- 4 -

Energetix maintains and distributes an Employee Handbook which provides that: "Communications media resources are Company assets that are to be used solely for management-approved business. These resources include, but are not limited to . . . computers." The Handbook also contains a Conflict of Interest Policy which notes that "employees who are also customers of the Company are entitled to the same rights and are under the same obligations as any other customer of the Company. Attempting to secure an advantage or benefit through your employment that is not available to other Company customers is strictly prohibited." Energetix's Business Practices and Policies Manual contains an identical Conflict of Interest Policy, which further provides that "users engaging in unauthorized activities may be subjected to disciplinary action. In the case of employees, this may include termination of employment."

After Bell returned from his FMLA leave on May 21, 2002, Modesti, Diamond and Cynthia Miller, a Human Resources representative, met with Bell concerning the changes that had been made to his household's account. Bell admitted that he had attempted to change the gas rate on the account to what he thought it should be, and that he knew he had no authorization to make the change. At the close of the meeting, Modesti suspended Bell without pay. At Modesti's request, Diamond prepared a written recommendation that Bell be terminated, which was approved in turn by Modesti, Energetix President Mike Bovalino and Tom Richards, the CEO of Energetix's parent company. Bell was terminated effective June 20, 2002.

In early June 2002, Bell filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR"), alleging hostile work environment and termination on the basis of his race, as well as retaliatory termination for having taken FMLA leave. The complaint was

dismissed by the NYSDHR on the grounds of administrative convenience, and Bell was issued a Right-to-Sue letter by the Equal Employment Opportunity Commission on January 16, 2003.  On January 30, 2003, Bell filed the instant action, alleging: (1) racial harassment during his tenure in the Supply Group; (2) discriminatory termination; (3) retaliatory termination for statements made at an NAACP meeting and for filing the NYSDHR complaint; and (4) retaliatory termination based on taking FMLA leave.

**DISCUSSION**

**I.  Summary Judgment in Discrimination Cases**

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, a common component of discrimination actions, *see Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988); *Montana v. First Federal Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir. 1989), "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to... other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion).  *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), *quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993) (trial courts should not "treat discrimination differently from other ultimate questions of fact").

Bell's claims of employment discrimination pursuant to Title VII and the NYHRL are subject to the burden-shifting analysis articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, plaintiff must establish a *prima facie* case of discrimination by demonstrating: (1) membership in a protected class; (2) satisfactory job performance; and (3) an adverse employment action, occurring under (4) circumstances giving rise to an inference of discrimination. *See Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002). Once plaintiff has established a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then returns to plaintiff, to supply evidence that the legitimate, nondiscriminatory reason offered by the defendant is a pretext. *See St. Mary's Honor Center*, 509 U.S. 502, 508 (1993).

While granting Bell the liberal interpretation and favorable inferences due to him as a nonmovant, I find that Bell has nonetheless failed to establish a *prima facie* case of discrimination, and/or to rebut the defendants' legitimate, nondiscriminatory reason for terminating his employment.

## II.   Bell's Discrimination and Retaliation Claims Against the Defendants[1]

### A.   Bell's Hostile Work Environment Claims

In order to prevail on a claim that unlawful harassment has caused a hostile work

---

[1] Defendants RG&E and Griffith Oil have also moved for summary judgment dismissing Bell's claims against them on the grounds that they were never Bell's "employers." However, an employee may be considered employed by multiple employers where those employers share: (1) interrelated operations; (2) centralized control over labor relations; (3) common management; and (4) common ownership or control. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1236, 1240-41 (2d Cir. 1995). It is undisputed that there is a close operational relationship between Energetix, RG&E and Griffith Oil, particularly with respect to human resources. I find that there are material questions of fact as to whether Griffith Oil and/or RG&E were Bell's joint employers, and accordingly, decline to grant summary judgment on employment relationship grounds. Thus, although the Court refers to Energetix as Bell's employer herein, to the extent that RG&E and/or Griffith Oil may be deemed Bell's joint employers, the Court's findings on Bell's claims apply equally to those parties.

environment in violation of Title VII, a plaintiff must demonstrate that the workplace was permeated with "discriminatory intimidation, ridicule, and insult... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and show a specific basis for imputing the conduct that created the hostile work environment to the employer. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). *See also Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

In determining whether conduct constitutes a hostile work environment, the Court must consider the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance. *See Winnie v. City of Buffalo*, 2003 U.S. Dist. LEXIS 1497 at *14-*15 (W.D.N.Y. 2003), *citing Harris*, 510 U.S. at 23.

Nonetheless, "Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999), *citing Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Although offensive language need not be directed toward a plaintiff in order to contribute to a hostile work environment, *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997), a few isolated incidents of "boorish or offensive use of language," particularly when heard "second-hand," are generally insufficient to establish a hostile work environment. *Benette v. Cinemark U.S.A., Inc.*, 2003 U.S. Dist. LEXIS 22636 at *18 (W.D.N.Y. 2003). See also *Clark County School District v. Breeden*, 532 U.S. 268, 270 (2001) (conduct must be severely threatening or humiliating to rise to the level of a hostile work environment); *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir. 1992) ("incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief").

Bell identifies the following conduct in support of his hostile work environment claim: (1) while working at Griffith Oil, Bell overheard a conversation in which an unknown employee commented that "90 percent of the African people are AIDS-infected and they're very filthy people"; (2) when someone asked Mike Turley, Bell's coworker at Griffith Oil, why Bell was working late one night, Turley replied that he was "a slave driver"; (3) while at Energetix, Strassner discussed a newspaper article about a police officer who had been disciplined for using racially inappropriate language, and related to Bell that years before, a friend had called him (Strassner) a "nigger"; (4) Strassner referred to Bell on several occasions as a "boy," and used the phrase, "go fetch that, boy"; (5) Strassner told Bell, who had been referring to Mike Bovalino as "Mr. B," that Bell might be seen as an "ass-kisser" for doing so; (6) Farnsworth, in discussing Bell's transfer, told him "it takes a special kind of person" to work in the Supply Group, and nodded when Bell responded by pointing to his hand, in an apparent acknowledgment of Bell's color; and (7) Farnsworth once commented that "rich blacks" like Latrell Sprewell, a professional basketball player whose career continued even after he threatened, attacked and choked a coach, and former professional football player O.J. Simpson, who was acquitted after a highly-publicized trial on double murder charges, "always get off."

Strassner later learned that his reference to having been called a "nigger" had offended Bell, and apologized to him. With respect to the "ass-kisser" comment, Bell confronted Strassner about it, and Strassner apologized and pledged to stop "joking" and keep the relationship more businesslike in the future.

While some of the comments made to Bell, or overheard by him, are unquestionably insensitive and offensive, I find that when viewed collectively, Bell's allegations describe isolated incidents which are not sufficiently severe, frequent, threatening, humiliating or distracting to give

rise to a hostile work environment. *See Hannon v. Wilson Greatbatch, Ltd.*, 2002 U.S. Dist. LEXIS 8862 at *28 (W.D.N.Y. 2002)(the "mere utterance of an epithet which engenders offensive feelings" is insufficient to sustain a hostile work environment claim); *Clark County School District v. Breeden*, 532 U.S. 268, 270 (2001) (conduct must be severely threatening or humiliating to rise to the level of hostile work environment); *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir. 1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment); *Schwap v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (establishment of a hostile work environment requires a steady barrage of racial comments, rather than isolated racial slurs); *Tomka v. Siler Corp.*, 66 F.3d 1295, 1304 n.5 (2d Cir. 1995) (occasional incidents of harassment will not justify relief) .

Moreover, it is undisputed that with the exception of the "ass-kisser" comment, about which Bell confronted Strassner directly, Bell never complained to Energetix about any of the allegedly discriminatory incidents, despite knowledge of Energetix's anti-harassment policy and the availability of Human Resources personnel to handle such complaints. Accordingly, Bell's hostile work environment claim must be dismissed.

**B.    Bell's Discriminatory Discharge Claim**

While conceding that the unauthorized changing of one's own billing rates in the Energetix computer system is a violation of Energetix's policies, Bell asserts that the true motivation behind Energetix's decision to terminate his employment was discriminatory.

Bell primarily relies upon two items to establish that his termination was pretextual: the testimony of Griffith Oil employee "Peggy" DeLong that Diamond made comments to her to the effect that he thought African-American employees were lazy, and that he preferred to hire and work with non-African-American employees, and a printed document which was purportedly found by

another Energetix employee in a copy room several weeks or months after Bell's termination, and forwarded to Bell's attorneys a few weeks later.

With respect to the document, its heading identifies it as an e-mail, printed by Diamond on Energetix letterhead paper, and originally sent by him on at 4:10pm on May 21, 2002, around the time of Bell's suspension meeting, to Strassner and Farnsworth.  The message is comprised solely of the text, "The jig has been lynched," which employs an abbreviated racial slur and a term meaning hanging and/or mob violence against an individual, which in the United States has come to be strongly associated with violence against African-Americans on the basis of race.

Because Energetix has produced evidence establishing a legitimate, nondiscriminatory reason for Bell's termination, Bell is required to come forward with evidence in admissible form to establish that Energetix's explanation for his termination is a mere pretext for discrimination.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that *the matter in question is what the proponent claims*." Fed. R. Evid. 901(a) (emphasis added).  Authentication "does not erect a particularly high hurdle . . . [t]he requirement under Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  *SCS Communications, Inc. v. The Herrick Co., Inc.*, 360 F.3d 329, 344 (2d Cir. 2004), *quoting United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001).

Based upon the testimony of Evelyn DeJesus ("DeJesus"), the Energetix employee who discovered the document, a reasonable juror could find that it has been authenticated as a printout which DeJesus discovered in her desk drawer, in a stack of papers she had removed from a shared printer at Energetix and placed in the drawer the day before.  However, for purposes of Bell's attempt to demonstrate pretext, there is no evidence that the document is otherwise "what the

proponent claims": the record of an e-mail message which was drafted and sent by Diamond to Strassner and Farnsworth on the day that Bell was suspended, and printed by him at or near the time it was found by DeJesus.  Fed. R. Evid. 901(a).[2]  Diamond, Strassner and Farnsworth all deny ever having generated, received or printed the document.

After the printout was brought to the attention of Energetix, Energetix conducted an internal investigation to determine whether it had originated there.  After a search of Farnsworth, Strassner and Diamond's hard drives gave no indication that the message had ever been sent, received, stored, deleted or printed from their e-mail files, Energetix retained the services of Entre Computer, an outside vendor, to restore backup tapes of its e-mail server and search for electronic copies of the message between April 2002 and December 2002.  Although Energetix avers that any e-mail printed after June 2, 2002 (the first date that daily, rather than monthly, backup tapes were available) would have been recorded, Entre Computer found no evidence of the document.  Finally, Energetix's counsel hired Kroll OnTrack, a computer forensics company, to analyze the hard drives of Diamond's and Strassner's computers (due to technical difficulties, Farnsworth's hard drive was not able to be examined) for evidence that the message had resided or been printed from there.  Despite these efforts, neither Energetix nor the two outside firms were able to find any evidence that the purported e-mail was ever written, sent, received or printed by Diamond, Strassner or Farnsworth.

---

[2]  It is undisputed that e-mail messages can be easily fabricated, and a host of websites offer software and instructions for creating and/or sending faux e-mails.  *See e.g.*, http://www.deadfake.com; http://www.fakemailz.com.  As such, a practical understanding of the available technology, both with respect to the fabrication of e-mails, and their preservation through electronic data, dictates that authentication of a printout as the hard copy of a bona fide e-mail message now requires something more than a bare conclusion that the printout "appears to be" an e-mail message.

While correctly arguing that there is at least a theoretical possibility that electronic evidence of the e-mail could have existed and been entirely overwritten before the June 2, 2002 backup tape was created, Bell has offered no expert opinion or other evidence to suggest that this is the case, and admits that no electronic evidence of the purported e-mail has been located to confirm its purported origin.  Furthermore, one need not be an expert in the field of computer forensics to recognize that if the e-mail had been sent by Diamond on May 21, 2002 but deleted and overwritten at some point within the next twelve days to eradicate any trace of its existence such that it would not appear on any of the named defendants' hard drives or Energetix's daily backup tape for June 2, 2002, it would have been impossible for Diamond to have printed it from his computer "weeks or months" after May 21, 2002, when DeJesus allegedly discovered it, commingled with papers she had just printed and removed from a copier the previous day.  *See* Hobday Depo., Dkt. #97, Att. 1, Exh. M at 27; DeJesus Depo., Dkt. #97, Att. 1, Exh. C at 30, 59.

Accordingly, authentication and admissibility of the document is limited to the relatively non-probative status of a printout discovered at Energetix, styled as a hard copy of an e-mail, but not demonstrably representing a *bona fide* e-mail message.

The cases relied upon by plaintiff with respect to the authenticity of e-mail printouts are inapposite.  Indeed, *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3* stands for the proposition that e-mails which are produced by third parties and offer detailed exchanges concerning contemporaneous events (the latter of which is a circumstance not present here) are authentic and admissible, but also holds that *where a party seeks to rely upon a printed e-mail but "offer[s] no proof that it is what it purports to be," it is inadmissible*.  2006 U.S. Dist. LEXIS 52870 at *19-*20 (S.D.N.Y. 2006) (emphasis added).  In *Monte v. Ernst & Young LLP*, also cited by Bell, the district court found certain e-mails to be admissible, in part, based on the lack of evidence to

show that they were fabricated. 330 F. Supp.2d 350, 358 n.2 (S.D.N.Y. 2004). Here, Energetix engaged two outside vendors to conduct extensive tests of the computer hard drives and back-up tapes of its server, all of which concluded that there was no evidence that the e-mail had ever been sent, received or printed at Energetix.

Thus, while the document would theoretically be admissible as one found by DeJesus in a copy room, subject to a probative-versus-prejudicial objection, it is not admissible as proof that Diamond sent a racist e-mail to the other individual defendants on the day Bell was suspended, and is thus insufficient to rebut Energetix's legitimate, nondiscriminatory reason for terminating Bell's employment.

Whether the printout, when combined with Diamond's alleged statements to DeLong to the effect that he preferred Caucasian workers, would be sufficient to rebut Energetix's nondiscriminatory reason for terminating Bell's employment, would present a closer question if Diamond had been the decision maker who made that determination. However, resolution of that issue is unnecessary on this motion, given Diamond's peripheral role in Bell's discharge. An employer's intent "must be evaluated by reference to the decision-maker actually ordering the adverse employment action, not to other persons in the company," and it is undisputed that Modesti – against whom no evidence of discriminatory animus has been introduced – made the ultimate decision to terminate Bell. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005). *See also McLee v. The Chrysler Corp.*, 109 F.3d 130, 139 (2d Cir. 1997) (summary judgment dismissing discriminatory discharge claim was proper, where there was no evidence that employee, against whom evidence of racial animus had been presented, was consulted by the who decided to discharge plaintiff); *Joiner v. American Red Cross*, 2004 U.S. Dist. LEXIS 14424 at *34 (W.D.N.Y. 2004) (granting summary judgment dismissing discrimination claim despite questions of fact concerning

- 14 -

the authenticity of a racially-charged e-mail purportedly authored by a manager at plaintiff's workplace, because the document neither referred to plaintiff nor involved the decision maker who terminated her).

Plaintiff argues that Modesti's decision to terminate Bell was nonetheless attributable to Diamond, because Diamond prepared a written recommendation for Bell's termination, which Modesti and others merely signed to approve and effect Bell's termination. *See generally Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 126 (2d Cir. 2004) (where ultimate decision maker is significantly influenced by termination recommendations from plaintiff's supervisors and makes no independent inquiry, plaintiff should not be required to demonstrate animus on the part of the decision maker, and may evade summary judgment by presenting evidence of discrimination by supervisors); *Hinton v. The City College of New York*, 2008 U.S. Dist. LEXIS 16058 at *58-*59 (S.D.N.Y. 2008) ("[r]equiring a Title VII plaintiff to prove that the ultimate decisionmakers... who may in fact give minimal scrutiny to recommendations received from below, were motivated by prohibited animus, would erect an insurmountable barrier for many plaintiffs who have experienced discrimination or retaliation that Title VII is intended to remedy").

However, it is undisputed that Modesti specifically instructed Diamond to prepare the recommendation, and there is no evidence that Modesti's determination to terminate Bell was influenced by any subjective input from Diamond.  Rather, Diamond's role in the termination appears to have been limited to bringing the issues with the Lenora Johnson account to Modesti's attention, gathering relevant documentation at Modesti's request, and following Modesti's orders to facilitate and attend the May 21, 2002 meeting with Bell.  Modesti's testimony that it was his responsibility to decide whether to terminate Bell, and that his decision was "[b]ased on the documentation of the changes to Mr. Bell's account, the note to Brian Buttars, [and] Mr. Bell's

confession" is not disputed. Dkt. #78 at ¶11. Because Modesti's decision to terminate Bell's employment was made independently of Diamond's input, plaintiff cannot evade summary judgment on his discriminatory discharge claim by attempting to establish discriminatory animus by Diamond. *See Woodman*, 411 F.3d 69 at 89.

I am also not persuaded by Bell's speculative argument that Energetix's reason for discharging him is a sham, and that his attempts to change the billing rate on his account were part of a "modification" that he undertook in the good faith belief that the billing rate for the account was incorrect, that any changes he made could be retained on the computer system without going into effect, or that Diamond had suggested to Bell that he give the note concerning the fictitious customer complaint to Buttars. The fact remains that regardless of Bell's intentions, Bell admitted at the May 21, 2002 meeting with Modesti that knew he was not authorized to try to alter his own billing rate on Energetix's computer billing system, and yet did so in violation of Energetix's policies.[3] *See DeLuca v. Allied Domecq Quick Service Restaurants*, 2006 U.S. Dist. LEXIS 39261 at *27 (E.D.N.Y. 2006) (an employer may undertake an adverse employment action "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). Indeed, after admitting his attempt to change the rate on his account at a hearing before a state-level Unemployment Insurance Hearing Officer, Bell was found to have been discharged for misconduct. *See Hill v. Coca Cola Bottling Co.*, 786 F.2d 550, 553 (2d Cir. 1986) (administrative decision of a state labor department is entitled to full faith and credit, and where state unemployment insurance hearing officer found that plaintiff committed misconduct, plaintiff is collaterally estopped from relitigating that issue in the context of a discrimination lawsuit). In light

---

[3] Bell's admissions are memorialized on an audio recording Bell made of the meeting. Dkt. #101, Exh. C.

of Bell's admitted misconduct and the lack of evidence indicating racial animus on the part of the

relevant Energetix decision maker, Bell cannot demonstrate that Energetix's reasons for terminating

his employment were pretextual.

Accordingly, Bell's claim of discriminatory discharge must be dismissed.

**C.      Bell's Title VII Retaliatory Discharge Claim Based Upon NAACP Activities and the Filing of an Administrative Charge**

Retaliation claims are also analyzed using the *McDonnell Douglas* burden-shifting

framework. *McDonnell Douglas*, 411 U.S. at 792.  On a motion for summary judgment, the plaintiff

must first establish a *prima facie* case of retaliation.  Once the plaintiff has done so, the burden shifts

to the defendant to establish a legitimate, non-retaliatory basis for the complained-of action. If the

defendant does so, the burden returns to plaintiff, who must show that the legitimate, non-retaliatory

reason articulated by the defendant is a mere "pretext," and that retaliation was more likely than not

the reason for the complained-of action.  *See Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000);

*Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir. 1998).

A plaintiff makes out a *prima facie* case of retaliation by showing: (1) his participation in a

protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff;

and (3) a causal connection between the protected activity and the adverse employment action.  *Id.*

Bell admits that he did not complain to Energetix about any of the comments that he now

relies upon to support his hostile work environment claim, but claims that he complained about his

employer at an off-site NAACP meeting in November 2001, which was jointly organized by the

NAACP and Richards, the CEO of Energetix's parent company, for RG&E employees.  Evidence

supporting this claim is scant.  Although Bell recalls complaining at the meeting to Bill Thomas,

RG&E's Vice President of Human Resources, he does not recall what he said.  Thomas testified that

Bell's comments dealt exclusively with his work assignment, and did not allege any race-based

harassment.  When Thomas discovered that Bell was an employee of Energetix rather than RG&E, he directed Bell to discuss his complaints with Energetix President Bovalino.  Bell did not do so.

However, even assuming *arguendo* that Bell had established his *prima facie* case of retaliation by demonstrating that he complained of racial harassment at the NAACP meeting, there is no indication that Energetix's reasons for terminating him were a pretext for unlawful retaliation.  Although Bell's termination took place about six months later and the "temporal proximity of these events" may be found to create "an inference of retaliation for the purposes of [Bell's] *prima facie* case, without more, such temporal proximity is insufficient to satisfy [Bell's] burden to bring forward some evidence of pretext."  *Simpson v. New York State Dep't of Civil Servs.*, 166 Fed. Appx. 500, 502 (2d Cir. 2006).  For the same reason, Bell's claim that he was terminated in retaliation for filing his NYSDHR charge, which occurred after Energetix had placed Bell on suspension and decided to terminate his employment, is grounded solely on temporal proximity, and must be dismissed.

Accordingly, Bell has failed to set forth a *prima facie* case of retaliatory termination based on his comments during an NAACP meeting or the filing of his administrative charge, and that claim must be dismissed.

**D.  Bell's Retaliatory Discharge Claim Based Upon the Taking of FMLA Leave Against RG&E and Energetix**

Bell also claims that his discharge occurred in retaliation for his having taken FMLA leave to recover from surgery, from April 2002 to May 2002.  At the same time, Bell concedes that he had no difficulty in obtaining Energetix's approval for the leave, and is unaware of any comments or actions by Energetix that would suggest that his termination was related to his leave.  Because there is no evidence whatsoever to establish circumstances giving rise to an inference that Bell's termination was connected with his FMLA leave, Bell cannot establish a *prima facie* case of

retaliatory discharge on that basis, and his claim must be dismissed.  *See e.g.*, *Simpson*, 166 Fed.

Appx. 500 at 502; *Bond v. Sterling, Inc.*, 77 F. Supp. 2d 300, 305 (N.D.N.Y. 1999).


### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. #74) is granted

and plaintiff's complaint is dismissed in its entirety, with prejudice.  Defendants' request for an *in*

*limine* order precluding plaintiff from making use of the purported Diamond e-mail at trial is denied

as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge


Dated: Rochester, New York
       March 26, 2008.